IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIMMER RONALDO MENDOZA MONROY, | § | |
| Petitioner, | § | |
| | § | |
| V. | § | No. 3:19-cv-1656-B |
| | § | |
| DEYSI LISSETH ARAUJO DE MENDOZA, | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Himmer Ronaldo Mendoza Monroy filed a Verified Petition for Return of Child to El Salvador pursuant to Article 3 of the Hague Convention on the Civil Aspects of International Child Abduction. *See* Dkt. No. 1. United States District Judge Jane J. Boyle referred this petition to the undersigned United States magistrate judge for evidentiary hearing and the submission of proposed findings of fact and recommendations under 28 U.S.C. § 636(b). *See* Dkt. No. 20. With the benefit of the evidentiary hearing held on September 13, 2019, see Dkt. Nos. 25 (hearing transcript) & 26 (admitted hearing exhibits), the undersigned enters these findings of fact and conclusions of law and recommends that the Court grant the petition.[1]

---

[1] The undersigned sets out proposed findings of fact and conclusions of law. *See* FED. R. CIV. P. 52(a)(1). Although the undersigned has carefully considered the hearing testimony and exhibits, the undersigned has written these findings, conclusions, and recommendation to comply with the level of detail required in this circuit for findings of fact and conclusions of law. *See, e.g.*, *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards). The undersigned has not set out findings and conclusions in punctilious detail, slavishly traced the claims issue-by-

## Background

## I.    Factual Background and Procedural History

On July 11, 2019, Petitioner filed his Verified Petition for Return of Child [Dkt. No. 1]. The petition asserts that E.L., a three-year-old child of Petitioner and Respondent Deysi Lisseth Araujo de Mendoza, was wrongfully removed and retained by Respondent in violation of the Hague Convention on the Civil Aspects of International Child Abduction Oct. 25, 1980, 1343 U.N.T.S. 89 (the "Hague Convention"), and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 22 U.S.C. §§ 9001-11. *See* Dkt. No. 1 ¶¶ 1-2.

Petitioner states that the child, E.L., lived in El Salvador up until August 2018, when Respondent and E.L. traveled to the United States with a vacation permit from a family court in El Salvador. *See id.* ¶¶ 13-17. Petitioner objected to the travel authorization and now attaches a number of Salvadoran judicial documents that show his opposition. *See* Pet'r's Ex.1. But the Salvadoran government overruled his objections, and Respondent left El Salvador with E.L. and entered the United States on August 11, 2018. *See* Dkt. No. 1 ¶¶ 17-18. And on August 25, 2018 – the day that the travel authorization expired – Respondent informed Petitioner that she never intended to return to El Salvador. *See id.* ¶ 19. To Petitioner's knowledge, E.L. has

---

issue and witness-by-witness, or indulged in exegetics, parsing, or declaiming every fact and each nuance and hypothesis. The undersigned has instead written a recommendation that contains findings and conclusions that provide a clear understanding of the basis for the proposed decision of the Court. *See id.*

remained with Respondent in Texas since then. *See id.* ¶¶ 11, 19. Petitioner filed this suit approximately ten-and-a-half months later. *See generally* Dkt. No. 1.

Respondent then filed her Original Answer. *See* Dkt. No. 8. Respondent entered a general denial and asserted three affirmative defenses, which, if proven, could bar return of E.L. to El Salvador: (1) proceedings were commenced more than one year after wrongful removal and the child is now settled; (2) there is a grave risk of harm if the child is returned; and (3) fundamental principles of El Salvador bar return of the child. *See id.* at 1-3. Respondent later amended her answer to include only affirmative defense (2), *see* Dkt. No. 14 at 2, although she relies on both affirmative defenses (2) and (3) in her pre-hearing brief, *see* Dkt. No. 15 at 7.

The Court held a show cause hearing on July 26, 2019. *See* Dkt. No. 13. At the hearing, E.L. appeared, along with counsel for Petitioner and Respondent. *See id.* Neither party denied the Court's jurisdiction. And Respondent's counsel surrendered passports for Respondent and E.L. *See id.*

## II. Legal Arguments

Petitioner asserts that he has proven a *prima facie* case for wrongful removal under the Hague Convention. *See* Dkt. No. 1 ¶¶ 25-34.

First, Petitioner asserts that E.L.'s habitual residence is El Salvador and that Respondent removed or retained E.L. outside of El Salvador. *See id.* ¶¶ 28-31. Both parties agree that E.L. was born in the United States in May 2016, where he stayed for about one-and-a-half months. *See* Dkt. No. 18 at 1; Dkt. No. 15 at 5; Dkt. No. 1 ¶ 13; Dkt. No. 25 (evidentiary hearing tr.) 14:19-22, 39:12-14. And they agree that E.L.

returned to El Salvador after birth, *see* Dkt. No. 18 at 1; Dkt. No. 15 at 5, although Respondent testified that, prior to August 2018, Respondent and E.L. took trips to the United States that accounted for six to eight months of E.L.'s life, *see* Dkt. No. 25 at 42:21-43:4.

And Petitioner offers evidence demonstrating that, on August 8, 2018, in El Salvador, Respondent received temporary travel permission to bring E.L. to the United States from August 11, 2018, until August 25, 2018. *See* Pet'r's Ex. 1 at 35. Petitioner opposed the travel authorization in Salvadoran court. *See id.* Now, Respondent and E.L. remain in the United States in violation of the authorization. *See* Dkt. No. 18 at 3; Dkt No. 1, Ex. C at 2.

Based on these circumstances, Petitioner argues that El Salvador is E.L.'s habitual residence and that Respondent removed E.L. from El Salvador. *See* Dkt. No. 1 ¶ 28.

Second, Petitioner contends that Respondent's retention of E.L. in the United States violates Petitioner's rights of custody under Salvadoran law. *See id.* ¶ 29. To establish his custodial rights, Petitioner offers portions of the Salvadoran Family Code. *See* Pet'r's Ex. 2. Article 207 of the Code states, in English, that "[t]he exercise of the parental authority corresponds to the father and mother jointly." Pet'r's Ex. 2 at 4. And Petitioner points out that his parental rights were never revoked; Petitioner and Respondent lack a final custody order; and Petitioner had open visitation rights with E.L. when Respondent and E.L. left for the United States. *See* Dkt. No. 18 at 6. Petitioner also cites Article 44 of El Salvador's Law of Integral Protection of Childhood

4

and Adolescence, which provides both parents a right to restrict a child from leaving the country. *See* Pet'r's Ex. 2 at 1. This law, Petitioner asserts, is a custodial right. *See* Dkt. No. 25 at 97:1-13. And, by removing E.L. from the United States, Petitioner contends, Respondent has deprived Petitioner of this custodial right. *See id.* at 97:16-21. In light of Salvadoran law, Petitioner argues that Respondent's retention of E.L. violated Petitioner's custodial rights. *See* Dkt. No. 1 ¶ 29.

Third, Petitioner asserts that he was actually exercising his custodial rights when Respondent removed E.L. from El Salvador. *See id.* ¶ 30. Petitioner states that, until E.L. left for the United States in August 2018, Petitioner visited E.L. at least weekly and financially assisted Respondent in caring for E.L. *See* Dkt. No. 18 at 7. Corroborating Petitioner's financial contributions, Respondent testified that Petitioner paid her child support for two months – until she left for the United States with E.L. *See* Dkt. No. 25 at 66:7-8. And Petitioner legally opposed Respondent's travel authorization in Salvadoran court. *See* Pet'r's Ex. 1 at 35. Through these actions, Petitioner contends that he actually exercised his custodial rights when Respondent took E.L. to the United States. *See* Dkt. No. 1 ¶ 30.

In response to Petitioner's contentions regarding wrongful removal, Respondent does not appear to dispute Petitioner's *prima facie* case. Rather, she focuses solely on the existence of affirmative defenses. *See* Dkt. No. 15 at 7-9. Respondent raises two affirmative defenses: (1) There is grave risk of physical or psychological harm to the child if returned; and (2) fundamental principles relating to protection of human rights and fundamental freedoms in El Salvador do not permit the return of the child. *See id.*

at 7.

In raising the grave-risk defense, Respondent alleges that Petitioner's history of domestic violence poses a grave risk of danger to E.L. if he returns to El Salvador. *See id.* at 8. First, Respondent asserts that she has suffered family violence and mental abuse at the hands of Petitioner. *See* Dkt. No. 14 at 2. This allegation is corroborated by the transcript of a Salvadoran family court proceeding, in which the court found that Petitioner "practiced psychological violence over [Respondent]" on June 12, 2018. Pet'r's Ex. 4 at 10. As a result, the court issued a protective order in favor of Respondent, which maintained Petitioner's rights of visitation with E.L. *See id.* at 11. Further, the family court issued a letter related to the protective order, which stated that the Respondent had "decided to separate from her husband, given that the situation represents a risk for the emotional health and integrity development of the child." *Id.* at 6.

Respondent also alleges that Petitioner would "hit, punch, and push Respondent" and "tie Respondent's hands and feet up so that she could not move or leave the house for extended periods of time." Dkt. No. 15 at 5. Respondent's exhibits do not provide additional evidence corroborating these allegations. But, at the evidentiary hearing, Respondent testified to other instances of alleged physical abuse: she testified that Petitioner gave her a black eye, locked her in the house without her phone, and waited about a week – until the bruise on her eye had healed – to return the phone. *See* Dkt. No. 25 at 44:8-45:2. Further, she testified that the physical abuse occurred "all the time," with Petitioner becoming angry when he disagreed with how

6

Respondent completed a task or when E.L. spilled something. *Id.* at 45:12-14. Respondent explained that she tried to report the physical abuse to a Salvadoran authority but that "they wouldn't accept anything if [she] didn't have any proof." *Id.* at 77:17-78:2.

To support this explanation, Respondent offered testimony from her mother, Elva Turcios, who testified that Salvadoran police never take women's physical abuse claims seriously. *See id.* at 87:19-22. Ms. Turcios further testified to other domestic violence cases in her family in which the aggressors did not face any consequences for their violence. *See id.* at 88:20-89:2. Likewise, Respondent's aunt, Reyna Rubio, testified to the Salvadoran police's lack of response in her other niece's domestic violence case. *See id.* at 91:3-10.

Finally, Respondent clarified that, contrary to Petitioner's contentions, *see id.* at 15:17-17:10, she could not receive a protective order in El Salvador just because she was jealous due to her husband's infidelity – she testified that there was a finding of family violence by the Salvadoran family court, *see id.* at 80:17-81:3.

Respondent's mother, Ms. Turcios, did not observe physical signs of abuse on Respondent when Respondent arrived in the United States in 2018. *See id.* at 83:12-84:2. Nor did Ms. Turcios ever witness Petitioner threaten Respondent, although, during one of her visits to El Salvador, she "could see that [Respondent] felt great fear for [Petitioner.]" *Id.* at 84:14-20. And Ms. Turcios stated that when Respondent arrived in the United States in August 2018, she "was in bad shape" psychologically. *Id.* at 83:23-84:4. Ms. Turcios also testified that Respondent told her about Petitioner's

physical abuse that both she and E.L. had endured. *See id.* at 84:3-8.

Contesting the allegations of abuse, Petitioner testified that the Salvadoran court's finding in the protective order of psychological violence arose out of Petitioner's admission that he had been unfaithful to Respondent. *See id.* at 15:17-17:10. Specifically, he pointed to the Salvadoran court's finding, which stated:

> It was not necessary the offer, acceptance and reception of supporting evidence[ ] since defendant did accept infidelity acts and psychological violence sustained, so they were released from evidence[ ]... It is confirmed that Mr. Himmer Ronaldo Mendoza Monroy has practiced psychological violence over Mrs. Deysi Lisseth Araujo de Mendoza....

Pet'r's Ex. 4 at 10. And Petitioner stated that no court has found that he physically abused his wife, nor that he has psychologically abused his wife based on any reason but an affair. *See* Dkt. No. 25 at 17:12-18.

To further support her grave-risk defense, Respondent reports that, two weeks after she received the protective order against Petitioner, Petitioner's father threatened to kill her and her family. *See* Dkt. No. 15 at 6. And she states that "Petitioner's family representatives would repeatedly call to threaten and harass [her.]" *Id.*

A police report filed on June 21, 2018 corroborates Respondent's allegation of a threatening phone call by Petitioner's father. *See* Resp't's Ex. 3 at 9-15. The report identifies Respondent as the victim and her father-in-law as the aggressor. *See id.* at 9-10. And the police classified the scale of abuse as "serious," on a scale ranging from "none" to "severe." *Id.* at 13; *see* Dkt. No. 25 at 54:1-9. The report also details that on June 20, 2018 – eight days after the protective order against Petitioner was issued – Respondent expressed fear because of her father-in-law's threats made against her and

her son. *See* Resp't's Ex. 3 at 12, 14.

Respondent echoed this fear in her United States asylum application, explaining that she was afraid her father-in-law would kill her if she returned to El Salvador, given that he had threatened the lives of Respondent, her brother, and her father. *See* Resp't's Ex. 4 at 5. She also stated that, if she and E.L. return to El Salvador, they "will be tortured and killed" by Petitioner's father. *Id.* at 6.

Finally, Respondent offers a transcript of the phone call from her father-in-law in which he states, in relevant part, "I am going to kill your tata and the other one from PNC ... I am going to go after what you love." Resp't's Ex. 7. Respondent testified that, in this phone call, Petitioner's father threatened to kill her, her father, and her brother. *See* Dkt. No. 25 at 58:13-16. And, based on Respondent's knowledge of Petitioner and his family, she believed that it would be reasonable to expect them to carry out this threat. *See id.* at 59:17-25.

While Petitioner objected to this translation of the phone call, he conceded that his father made some threats on the phone call. *See id.* at 54:17-21, 55:18-21.

Respondent finally alleges that Petitioner abused E.L. and thus poses a grave risk of harm to E.L. *See* Dkt. No. 15 at 8. Specifically, Respondent testified that Petitioner "would scold him, hit him, [and] bite him." Dkt. No. 25 at 43:12. Respondent testified to one specific bite by Petitioner, but the circumstances surrounding the discovery of the bite are unclear from the record. According to Respondent, biting was Petitioner's way of punishing E.L., though this was the first time that Petitioner had left a bruised mark. *See id.* at 61:20-23. In her asylum application, Respondent

9

indicates that she "found out [Petitioner] had bit [her] son" on June 12, 2018. Resp't's Ex. 4 at 5. But this detail does not appear in Respondent's description of the events of June 12, 2018, during the domestic violence preliminary hearing. *See* Dkt. No. 14, Ex. A at 9. And, in her evidentiary hearing testimony, Respondent stated that the bite occurred on June 10, 2018 and that she noticed it the following day. *See* Dkt. No. 25 at 61:13-21. Respondent testified that officials at the United States Embassy instructed her to report the bite to the police but that, because the bite was already starting to fade, the officials could not help her. *See id.* at 60:10-61:6.

Respondent also testified that, when E.L. would cry, Petitioner "would grab him from the arms and put him outside the door," prohibiting Respondent from opening the door to retrieve E.L. until Petitioner "got tired of him." *Id.* at 43:12-17. According to Respondent, Petitioner has punished E.L. this way since he was one-and-a-half years old. *See id.* at 43:23-25. And Respondent contends that Petitioner would shake and "aggressively h[o]ld" E.L., causing bruises on his body. Dkt. No. 15 at 5. In the same vein, Respondent's mother, Ms. Turcios, testified that Petitioner was a violent person, stating that, when the family was going to get in the car, Petitioner "would grab the child from one hand and just throw him ... on the seat." Dkt. No. 25 at 84:22-85:3.

In her testimony, Respondent also made a few other allegations relating to child abuse. For example, she mentioned that Petitioner would smoke marijuana around E.L. and that Petitioner used cocaine. *See id.* at 40:24-41:15. And she stated that Petitioner prevented her from taking E.L. to the doctor in El Salvador for his speech problem. *See id.* at 70:3-10. Since Petitioner's brother has a similar speech problem,

10

Respondent testified, Respondent "could not touch that subject with [Petitioner]" because he would become upset. *Id.* at 70: 1-7. Accordingly, Respondent stated that, if E.L. returns to El Salvador, Petitioner would not seek reasonable medical care for E.L. *See id.* at 70:14-18. But Petitioner testified that he has previously attended some of E.L.'s medical appointments with Respondent and that he took E.L. to private consultations. *See id.* at 35:5-13.

According to Respondent, "[e]verything [Petitioner] did was to harm the child. He would either scream at him or hit him." *Id.* at 47:22-25. Thus, Respondent believes that, if E.L. were returned to El Salvador to live with Petitioner, E.L. would be "at risk of dying." *Id.* at 48:1-4. Similarly, Ms. Turcios testified to her belief that, if E.L. were to return to El Salvador, he would be endangered due to Petitioner's physical and emotional mistreatment. *See id.* at 86:5-11. Ms. Turcios also testified that, in addressing reports of child abuse, the local authorities favor the party with influence in the government. *See id.* at 88:1-9. Echoing this sentiment, Respondent's aunt, Reyna Rubio, testified that the Salvadoran government and police were "super corrupt." *Id.* at 90:11-16. Further, Ms. Turcios stated that Petitioner is affluent and well-known in El Salvador. *See id.* at 88:10-12.

In response to these child abuse allegations, Petitioner denies ever abusing his son. *See id.* at 17:21-22. And he specifically denies ever biting E.L. *See id.* at 92:24-25. Petitioner suggested in his testimony that Respondent's reference to a bite mark "concerns [him], because [Respondent] might have done that herself" to supply a reason to stay in the United States. *Id.* at 93:1-6. Further, Petitioner testified that he took

11

drug tests ordered by the Salvadoran court and that they all came back negative. *See id.* at 95:4-8.

In addition to alleging a grave risk to E.L., Respondent asserts that fundamental principles relating to human rights and freedoms of El Salvador prohibit return of E.L. *See* Dkt. No. 15 at 7. But Respondent omits this argument from her amended answer, and she only conclusively asserts the defense in her brief. *See id.*; Dkt. No. 14. Accordingly, she presents no evidence supporting the application of the defense.

## Legal Standards

## I.    Petitioner's *Prima Facie* Case

Petitioner raises a single claim for wrongful removal and retention of a child under Article 3 of the Hague Convention. The *prima facie* elements of an Article 3 Hague Convention claim for wrongful removal and retention require a showing that:

> (1)    "the respondent removed or retained the child somewhere other than the child's habitual residence";
>
> (2)    "the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws"; and
>
> (3)    "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

*Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (internal quotation marks omitted). A petitioner must prove each of these elements by a preponderance of the evidence. *See id.*

The petitioner must first establish that the respondent removed or retained the

child somewhere other than the child's habitual residence. The Hague Convention does not define "habitual residence," but the United States Court of Appeals for the Fifth Circuit focuses on the parents' subjective intentions, which are dispositive where "the child is so young that 'he or she cannot possibly decide the issue of residency.'" *Id.* at 310 (citation omitted). In such a case, "the threshold test is whether both parents intended for the child to 'abandon the [habitual residence] left behind.'" *Id.* at 310-11 (alterations in original) (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001)). And, when a child's initial move from a habitual residence was intended to be for a specific duration, courts typically do not find a change in the child's habitual residence. *See Larbie*, 690 F.3d at 311 (citing, inter alia, *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004)).

The petitioner next must demonstrate that the respondent's removal of the child violated petitioner's rights of custody under the habitual-residence nation's law. "Rights of custody" include "rights relating to the care of the ... child and, in particular, the right to determine the child's place of residence." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (citing Article 5(a) of the Hague Convention). But a violation of a petitioner's rights of access is not sufficient to trigger the Hague Convention's return remedy. *See id.* at 9 (citing Article 5(b) of the Hague Convention).

Finally, the petitioner must demonstrate that he actually exercised rights of custody at the time of removal. In making this determination, the Court "must not cross the line into a consideration of the underlying custody dispute." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004). Thus, "American courts have

13

interpreted 'exercise' broadly." *Id.* (collecting cases). Following this broad interpretation, the Fifth Circuit has held that, "in the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Id.* at 345. Accordingly, the removing parent must show that the petitioning parent has abandoned the removed child to demonstrate the petitioning parent's failure to exercise custody rights. *See id.*

## II.    Respondent's Affirmative Defenses

If the petitioner is successful in proving the above elements, the burden then shifts to the respondent to raise a valid affirmative defense. *See Larbie*, 690 F.3d at 308.

Under Article 13(b) of the Hague Convention, a judicial authority is not required to return a child, despite a finding that the child was wrongfully removed, if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The respondent has the burden of proving a grave risk by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). "A high threshold exists for establishing the grave risk of harm defense." *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575 (W.D. Tex. 2013). And clear and convincing evidence is "that weight of proof which produces in the mind of the trier of fact a firm belief ... as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d

386, 396 (5th Cir. 2004) (citations omitted; internal quotation marks omitted).

And, even if the respondent proves the grave-risk defense, a court has discretion to order the child returned to his place of habitual residence "if return would further the aims of the [Hague] Convention." *England v. England*, 234 F.3d 268, 270-71 (5th Cir. 2000). The Convention strives to both "secure the prompt return of children wrongfully removed or retained in any Contracting State" and "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention art. 1.

"[A] grave risk or intolerable situation exists where return of the child would send the child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect." *Vazquez v. Estrada*, No. 3:10-CV-2519-BF, 2011 WL 196164, at *5 (N.D. Tex. Jan. 19, 2011) (citing *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003), and *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)). Possible separation of a child and parent is insufficient to trigger the grave-risk defense. *See Madrigal v. Tellez*, 848 F.3d 669, 677 (5th Cir. 2017). And a court is not required to find a grave risk when it finds that a child's parent has been abused by his or her spouse. *See Soto v. Contreras*, 880 F.3d 706, 712-13 (5th Cir. 2018) (rejecting a "bright-line rule that allegations of spousal abuse create grave risk").

In addition to the grave-risk defense, Article 20 of the Hague Convention creates another defense: A court is not bound to order return of a child if return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Article 20 is to be "restrictively

15

interpreted and applied." *Souratgar v. Lee*, 720 F.3d 96, 108 (2d Cir. 2013) (quoting U.S. State Dep't, *Hague International Child Abduction Convention: Text and Legal Analysis*, Pub. Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). The defense applies on the "rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Id.*

Respondent has the burden of proving the fundamental-principles defense, like the grave-risk defense, by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). And, like the grave-risk defense, this defense affords great discretion to the court, such that, even if the fundamental-principles defense is proven, the "district court is not necessarily bound to allow the child to remain with the abducting parent." *Souratgar*, 720 F.3d at 103 (quoting *Blondin v. Dubois*, 189 F.3d 240, 246 n.4 (2d Cir. 1999)). Some courts have found the grave-risk defense and fundamental-principles defense so similar that they have suggested that the defenses are "redundant." *See, e.g.*, *Danaipour v. McLarey*, 183 F. Supp. 2d 311, 326 (D. Mass. 2002), *rev'd on other grounds*, 286 F.3d 1 (1st Cir. 2002) (explaining that, "[i]f return of a child would violate fundamental principles relating to human rights, it would also involve returning him or her to an intolerable situation"); *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 n.37 (E.D. Va. 2002) (same).

## Analysis

### I. Evidentiary Objections

Petitioner objected to Respondent's Exhibit 7, the translated transcript of Petitioner's father's phone call to Respondent. Specifically, Petitioner objected to a

16

"self-serving" translation from Respondent, but Petitioner lacked an alternative translation. Dkt. No. 25 at 54:17-21, 55:7-17. Petitioner also suggested that the translation of the phone call lacked relevance, while Respondent argued that it was relevant to the pattern of abuse that Respondent endured at the hands of Petitioner and his family. *See id.* at 57:3-10.

But the recording itself was played in open court without objection, and Respondent was asked about its content. The undersigned concludes that Petitioner has no valid objection to the transcript's admissibility based on authenticity or accuracy. And the undersigned determines that the transcript of the phone call is relevant – although, even if the undersigned assumes that Respondent's translation of the phone call is accurate, the phone call, along with the remaining evidence presented, fails to overcome Respondent's clear-and-convincing-evidence burden, as discussed below.

Petitioner's objections to Respondent's translation, offered as Respondent's Exhibit 7, are overruled, and Respondent's Exhibit 7 is admitted.

## II.    Petitioner's *Prima Facie* Case

Petitioner has established, by a preponderance of the evidence, that Respondent removed or retained E.L. somewhere other than E.L.'s habitual residence. Since E.L. is too young to determine his own residence, both parents' subjective intentions control. *See Larbie*, 690 F.3d at 310-11. And, here, regardless of Respondent's intentions, Petitioner clearly intended that E.L. reside in El Salvador and that E.L.'s visit to the United States be of limited duration. Even if E.L. lived in the United States for one-

17

and-a-half months following birth, he subsequently returned to El Salvador, where he lived for roughly two years – aside from some trips to the United States – before Respondent removed him on August 11, 2018. *See* Dkt. No. 18 at 1; Dkt. No. 15 at 5; Dkt. No. 25 at 42:21-43:4. This extended amount of time, during which E.L. lived in El Salvador, corroborates Petitioner's intention that E.L. live permanently in El Salvador. Moreover, Petitioner legally opposed E.L.'s August trip to the United States based on his fear that Respondent would not return. *See* Dkt. No. 1 ¶ 16. Thus, Petitioner expressed a clear intention that E.L. was not to live in the United States; rather, E.L. was only to visit the United States for a specified duration.

Accordingly, Petitioner has shown that E.L.'s habitual residence is El Salvador. And it is undisputed that Respondent removed E.L. from El Salvador to the United States in August 2018. *See id.* ¶¶ 13-17; Dkt. No. 15 at 6. Thus, the Court should find that Petitioner has shown that Respondent removed or retained E.L. outside of his habitual residence.

Next, Petitioner has shown that Respondent's retention of E.L. violated Petitioner's custodial rights under Salvadoran law. Because El Salvador is E.L.'s habitual residence, the Court must apply Salvadorian law to determine Petitioner's custodial rights. When determining issues of foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. In *Salguero v. Argueta*, 256 F. Supp. 3d 630 (E.D.N.C. 2017), a district court found that the petitioner-parent had custody rights when the family court of El Salvador permitted

18

the petitioner-parent to have open visitation with the child and there was no order terminating petitioner's parental authority. *See* 256 F. Supp. 3d at 637-38.

Like the parent in *Salguero*, Petitioner had visitation rights with his child, E.L. *See* Dkt. No. 18 at 6; *see also* Resp't's Ex. 2 at 6 (granting Petitioner, despite the restraining order against him, overnight visits with E.L.). And there is no evidence suggesting that Petitioner's custodial rights have been terminated. Further, Salvadoran law provides both parents of a child with parental authority—including the right to restrict the child's ability to leave the country. *See* Pet'r's Ex. 2 at 1, 4. Given that Respondent has retained E.L. outside of El Salvador beyond her authorized travel period, and over Petitioner's objection, the Court should find that Respondent's retention of E.L. violated Petitioner's custodial rights.

In addition, Petitioner has shown, by a preponderance of the evidence, that he was actually exercising his custodial rights at the time of wrongful removal or retention. Until E.L. left for the United States in August 2018, Petitioner asserts that he visited and financially supported E.L. *See* Dkt. No. 18 at 7. And Respondent confirmed through her testimony that Petitioner paid child support for two months leading up to Respondent and E.L.'s departure for the United States. *See* Dkt. No. 25 at 66:7-8. Further, Petitioner opposed Respondent's travel authorization in Salvadoran court, fearing that E.L. would not return. *See* Pet'r's Ex. 1 at 35. Where "even occasional contact" by Petitioner constitutes the actual exercise of his custodial rights, *Sealed Appellant*, 394 F.3d at 345, and Respondent has not presented any evidence suggesting that Petitioner has abandoned E.L., the Court should conclude that

19

Petitioner has proven this element by a preponderance of the evidence.

## III.   Respondent's Affirmative Defenses

### A.     Grave Risk

The Court should find that Respondent has not established a grave risk of harm to E.L. by clear and convincing evidence. Here, Respondent alleges there is a grave risk of harm to E.L. based on Petitioner's abuse of Respondent; Petitioner's father's threats toward Respondent; and Petitioner's abuse of E.L.

The undersigned will first address whether the behavior of Petitioner and his father demonstrates a grave risk of harm to E.L. Next, the undersigned will turn to whether Respondent's child abuse allegations suffice to show a grave risk of harm to E.L. Finally, the undersigned will analyze the totality of the evidence in light of Respondent's clear-and-convincing burden.

Spousal abuse is relevant to the grave-risk defense if the abuse "seriously endangers the child." *Souratgar*, 720 F.3d at 103-04.

For example, a panel of the United States Court of Appeals for the First Circuit has determined that a respondent-mother had proven that her children faced "a grave risk of exposure to physical or psychological harm should they be returned" based on the petitioner-father's violent tendencies. *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). In *Walsh*, the petitioner had an "uncontrollably violent temper" – he had committed "bloody and severe" assaults. *Id.* at 220. Although the petitioner-father did not direct violence toward his children, the children witnessed some of these assaults. *See id.* And the petitioner had "demonstrated that his violence knows not the bonds

between parent and child or husband and wife," given that he had assaulted both his adult son and wife. *Id.* at 209-10, 219-20. Additionally, the petitioner violated multiple court orders – giving the court "every reason to believe" he would violate future court orders. *Id.* at 221. As a result of the continued violence, one of the petitioner's children was diagnosed with post-traumatic stress disorder based on her father's violence – she even witnessed her father push her mother down stairs. *See id.* at 211. Combining this history of abuse with research suggesting that children of a spousal abuser often become victims of the abuser, the court found that the children faced a grave risk of harm. *See id.* at 220.

On the other hand, the grave-risk defense did not apply where the petitioner-parent beat the respondent-parent in the presence of the abducted child. *See Stewart v. Marrun*, No: 4:09-CV-141, 2009 WL 1530820, at *4 (E.D. Tex. May 29, 2009). The court in *Stewart v. Marrun* reasoned that the abuse by petitioner was "not enough to establish that the [c]hild would be placed at grave risk by being returned" given that there was "no evidence that [the] [p]etitioner ... ever abused the [c]hild or made threats against the [c]hild." *Id.*

Likewise, a respondent-parent did not establish the grave-risk defense where there was evidence that the petitioner had harmed her in the past but no evidence that the petitioner would harm the child or subject the child to harm. *See Guaragno v. Guaragno*, No. 7:09-CV-0187-O, 2010 WL 11619709, at *7 (N.D. Tex. May 18, 2010).

Here, to show a grave risk of harm to E.L., Respondent offers evidence of Petitioner's and Petitioner's father's abusive behavior. First, Respondent points to her

protective order against Petitioner. This protective order, issued against Petitioner, is based on his use of psychological violence against Respondent. *See* Pet'r's Ex. 4 at 10-11. And Respondent offers a letter from the Salvadoran court related to the protective order, in which it acknowledges that "the situation represent[ed] a risk for the emotional health ... of the child." *Id.* at 6. Corroborating Petitioner's psychological abuse of Respondent, Respondent's mother testified that she witnessed Respondent's "great fear" of Petitioner. Dkt. No. 25 at 84:14-20.

In terms of physical abuse suffered by Respondent, Respondent testified that Petitioner abused her often, and she relayed an instance in which Petitioner gave her a black eye and prevented her from leaving their home or communicating with others until it healed. *See id.* at 44:8-45:2, 45:12-14. Respondent further explained that Salvadoran authorities would not accept her abuse allegations without any proof. *See id.* at 77:17-78:2. Her mother and aunt confirmed this assertion, testifying that, based on their experiences, Salvadoran police fail to take women's physical abuse claims seriously. *See id.* at 87:19-25, 90:8-13, 91:3-10. But neither Respondent's mother nor her aunt could testify to Petitioner's physical abuse of Respondent. *See id.* at 83:12-84:2, 89:24-92:4.

Respondent also points to Petitioner's father's threatening phone call as evidence of a grave risk to E.L. *See* Dkt. No. 15 at 6. To corroborate the phone call, Respondent provides a police report, which alleges serious abuse by Petitioner's Father against Respondent. *See* Resp't's Ex. 3 at 9-10. In the report, the police explain that, eight days after Respondent received a protective order against Petitioner, Respondent expressed

fear due to Petitioner's father's threats against her and her son. *See id.* at 12, 14. In both her asylum application and testimony, Respondent indicates that the threat by Petitioner's father was directed toward her, her brother, and her father. *See* Respt's Ex. 4 at 5; Dkt. No. 25 at 58:13-16. And Respondent offers a transcript of the recorded phone call, in which Petitioner's father says, "I am going to kill your tata and the other one from PNC ... I am going to go after what you love." Respt's Ex. 7. Further, Respondent believed that it was reasonable to expect her father-in-law to carry out his threat. *See* Dkt. No. 25 at 59:17-25. Accordingly, she stated in her asylum application that she and E.L. will be killed by Petitioner's father if they return to El Salvador. *See* Resp't's Ex. 4 at 6.

Although Respondent has offered some evidence of violence by both Petitioner and his father, she has not offered clear and convincing evidence of "serious abuse" that "seriously endangers" E.L. *Vasquez*, 2011 WL 196164 at *5 (citations omitted); *Souratgar*, 720 F.3d at 103-04. Unlike the violence at issue in *Walsh*, Petitioner's violence is not so severe as to warrant a finding of serious endangerment to E.L. First, Respondent's protective order was based upon a court finding of psychological – not physical – violence. And Respondent's most specific testimony of Petitioner's physical violence against her, a strike causing a black eye, is undoubtedly serious and despicable. But Respondent offered no testimony nor evidence to corroborate this incident. And, even if Respondent's testimony – both of this instance of spousal abuse and general allegations of physical abuse – is entirely credible, it does not amount to clear and convincing evidence of a grave risk to E.L. While Petitioner's instances of

violence toward Respondent may suggest an unstable and unloving home life for E.L., the evidence fails to provide the undersigned with the basis for a "firm belief" that E.L. will be seriously endangered upon return to El Salvador. *Shafer*, 376 F.3d at 396.

Rather, the facts of this case, as demonstrated by the evidence, fall more closely to those of *Stewart* and *Guaragno*. In both cases, the district court found the petitioner's abuse of respondent insufficient to show a grave risk to the child. *See* 2009 WL 1530820, at *4; 2010 WL 11619709, at *7. Following this reasoning, the undersigned concludes that Respondent has not overcome the "high threshold" of the grave-risk defense by relying on Respondent's domestic violence allegations against Petitioner. *Gallardo*, 954 F. Supp. 2d at 575.

And, although the threat by Petitioner's father suggests violence by Petitioner's family against Respondent, Respondent's translated transcript of the call makes no mention of E.L. Accordingly, like Respondent's allegations of domestic violence by Petitioner, this phone call is insufficient to demonstrate a grave risk to E.L. The law governing this defense does not account for the respondent-parent's risk of harm – it instead focuses on the risk of harm to the child.

Accordingly, child abuse can give rise to application of the grave-risk defense. *See, e.g.*, *Teresa Velasquez Santana v. Ermelinda Demesio Benitez*, No: 4:14-CV-400-BJ, 2014 WL 11484971, at *4 (N.D. Tex. Nov. 3, 2014). For instance, a child faced a grave risk of physical and psychological harm from his father where he was forbidden from attending school; his father and mother physically struck him; and the child believed he would be killed if forced to return to his parents. *See id.*

24

But bare allegations of child abuse are insufficient to establish a grave risk. *See, e.g.*, *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640-41 (S.D. Tex. 2017). In *Tavarez v. Jarrett*, the respondent-parent argued that his child faced a grave risk of harm upon return to Mexico because the petitioner-parent allegedly physically abused the child. *See id.* at 640. The respondent-parent testified that the petitioner-parent often returned the child to the respondent-parent with "marks on her chin, nose, and forehead." *Id.* at 641. The petitioner-parent denied ever abusing the child, and the respondent-parent's witness, a doctor that treated the child, never witnessed or observed signs of abuse. *See id.* at 633, 641. In addition, the respondent-parent never reported abuse to the child's doctor or a local authority. *See id.* at 641. And the court held that the respondent-parent failed to establish a grave risk to the child by clear and convincing evidence. *See id.*

Like the respondent in *Tavarez*, Respondent here alleges child abuse by Petitioner, and she testified that Petitioner would scold, hit, and bite E.L. She also testified that biting was Petitioner's form of punishment for E.L. Respondent recalled a specific instance in which she discovered a bruised bite on E.L., and she recounted this in her asylum application. But she lacks any other witnesses or evidence corroborating the existence of the bite. Respondent also testified that, in addition to biting E.L., Petitioner would punish E.L. by leaving him outside of the home while he cried and prohibiting Respondent from retrieving him for some amount of time. But this allegation also lacks corroboration. While Respondent's mother did testify that Petitioner would throw E.L. into the car, this was the extent of her child-abuse-related

25

testimony.

Respondent's bare allegations of child abuse, like those at issue in *Tavarez*, are insufficient to demonstrate a grave risk of harm to E.L. by clear and convincing evidence. The respondent-parent in *Tavarez* alleged that he witnessed marks on his child, suggesting child abuse by the petitioner-parent. *See* 252 F. Supp. 3d at 640-41. Likewise, here, Respondent alleges child abuse by Petitioner based on a bite mark she observed. And she testifies to Petitioner's cruel methods of punishing E.L. But, like the testimony in *Tavarez*, Respondent's testimony alone does not cross the threshold to clear and convincing evidence of a grave risk to E.L. The Court should find that Respondent's limited, though disturbing, evidence of child abuse does not amount to clear and convincing evidence of a risk of harm to E.L. upon return to El Salvador.

And, viewing the evidence as a whole, the undersigned concludes that Respondent has not met her high burden of demonstrating a grave risk to E.L. if he were returned to El Salvador. As discussed above, evidence of spousal abuse by the petitioner-parent is relevant to the extent that it suggests serious endangerment of the child. Here, Respondent has offered evidence that she faces abuse by Petitioner and serious threats from Petitioner's father, but that evidence does not suggest a clear threat to E.L. And, while a petitioner-parent's abuse of the removed child can warrant a finding of a grave risk to the child, the respondent-parent's high burden remains: She must show a grave risk to the child by clear and convincing evidence. In light of the limited allegations of child abuse, which lack corroboration, Respondent has not cleared this hurdle. Even if the Court fully credits the testimony of Respondent and her

witnesses, the Court is bound to assess the evidence in light of the clear-and-convincing burden. And, here, the Court should find that Respondent has not provided clear and convincing evidence that E.L. faces a grave risk of harm upon return to El Salvador.

### B.    Fundamental Principles

The Court should also find that Respondent has failed to prove, by clear and convincing evidence, that return of E.L. is prohibited by fundamental principles of El Salvador. Respondent states that fundamental principles relating to human rights and freedoms of El Salvador prohibit the return of E.L. to El Salvador. But she fails to develop this argument, merely including a reference to the defense in her briefing.

In light of Respondent's lack of evidence regarding this defense, and the rarity of its application, the Court should find that it does not apply. Like the grave-risk defense, Respondent has the burden of proving the fundamental-principles defense by clear and convincing evidence. Respondent failed to meet this burden and, in fact, failed to offer any evidence of El Salvador's fundamental principles. Accordingly, the Court should find that Respondent has not proven, by clear and convincing evidence, that fundamental principles of El Salvador bar E.L.'s return.

### Recommendation

The Court should grant Petitioner's Verified Petition for Return of Child to El Salvador [Dkt. No. 1].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within

14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: September 20, 2019.

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE